**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARCELLA MULLINS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  44A03-1303-CR-102 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

### INTERLOCUTORY APPEAL FROM THE LAGRANGE CIRCUIT COURT
The Honorable J. Scott Vanderbeck, Judge
Cause No. 44C01-1205-FB-14

**August 21, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

The appellant-defendant, Marcella Mullins, brings this interlocutory appeal challenging the trial court's denial of her motion to suppress following the police officer's protective sweep of her residence and subsequent seizure of drugs and other contraband that were in plain view. Mullins argues that the alleged protective sweep that was performed after receiving reports that there was a burglary in progress at the residence violated both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. Mullins claims that the protective sweep of the residence was too broad and impermissibly led to the officers' discovery of the drugs and paraphernalia.

We find that the officer's sweep of the suspected burglary crime scene in areas where other suspects and potential victims might be found was valid under both the Federal and State Constitutions. We also conclude that Mullins's remaining issues that challenge the validity of the search warrant, her arrest, and recorded statement that was made later, are not available in this interlocutory appeal. Thus, we affirm the trial court's denial of Mullins's denial of her motion to suppress and remand this case for trial.

FACTS

On May 11, 2012, at approximately 8:00 p.m., LaGrange County Sheriff's Deputy Ryan Plummer received a dispatch regarding a burglary in progress at a residence in Wolcottville. The dispatcher indicated that the suspect had entered the house with a

2

knife. Although a description of the individual was given, no name of the suspected burglar was supplied.

One of the witnesses informed the dispatcher that the man was loading electronics and other items from the residence into some garbage bags. Deputy Plummer arrived at the residence in about seven minutes where he met Marshall Justin Baugh of the Wolcottville Town Marshall's Office. The witnesses at the scene were on the street and identified the residence.

Deputy Plummer saw the individual, who was later identified as Cody Mullins, through the bay windows. Deputy Plummer watched Cody toss CDs and electronic equipment into the bags. At some point, Deputy Plummer drew his gun and verbally ordered Cody from the residence at gunpoint through the open main door. Cody complied and was patted down and handcuffed.

While Marshall Baugh detained Cody, Deputy Plummer entered the residence through the main door that was open and conducted a "sweep" of the residence for other suspects and potential victims. Tr. p. 7. The officer knew through his experience that burglars often work in teams, where entry is made in one location and other accomplices subsequently enter the residence at another point. Deputy Plummer did not know if Cody was acting alone. He verbally announced his presence and cleared each room only for places that a person might hide. Detective Plummer did not touch anything or open any drawers.

Deputy Plummer noticed several garbage bags on the floor underneath the bay windows and a number of baggies of a white powdery substance, some hollowed pintubes, and hanging marijuana leaves in a bedroom. Deputy Plummer also detected a strong chemical odor consistent with the manufacture of methamphetamine in the upstairs of the residence. The cursory sweep lasted for approximately five minutes, and Deputy Plummer exited the house after he was unable to locate any other persons in the residence.

Thereafter, Deputy Plummer advised Cody of his Miranda[1] rights. Cody stated that he was Frank Mullins's brother, who rented the residence. Cody stated that he lived there but was removing his property. The officers did not arrest Cody at that time.

Frank was later summoned from his place of employment and was also advised of his Miranda rights. Deputy Plummer informed Frank of the suspected drugs that were found in the bedroom, and Frank confirmed that the bedroom belonged to him and Mullins, his wife. After speaking with counsel, Frank declined consent to a search of the residence.

Thereafter, Detective Plummer applied for a search warrant based upon what he discovered during the sweep of the residence. When executing the warrant, the officers discovered multiple pipes and smoking devices, along with folded foils and other trash from the manufacture of methamphetamine. A substantial quantity of a white powdery substance was also seized that "field tested" positive for methamphetamine. Tr. p. 10-11.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Finally, the officer discovered a large quantity of precursors and active methamphetamine labs hidden in an attic space.

While the search was being conducted, Mullins came home from work and appeared to be "extremely excited." Id. at 12. After Mullins was arrested for maintaining a common nuisance in light of the evidence that was found, the officers searched her backpack incident to the arrest. During that search, the officers found a plastic bag of wadded coffee filters that contained a white powdery residue that tested positive for methamphetamine. Mullins was then advised of her Miranda rights, but she declined to answer any of the officers' questions. Frank was questioned again, and he admitted using methamphetamine but denied any knowledge of controlled substances at the residence.

Several days later, Mullins made two requests through the jail system to speak with Deputy Plummer. Mullins was re-advised of her Miranda rights, which she acknowledged and signed. In a recorded interview, Mullins stated that she assisted Frank purchase precursors for him to manufacture methamphetamine, but claimed that she did not know that he was actually manufacturing methamphetamine at the house. Mullins admitted to using methamphetamine and that she and Frank rented the residence and maintained it together.

Thereafter, the State charged Mullins with dealing in methamphetamine, a class B felony, possession of precursors, a class D felony, possession of methamphetamine, a class C felony, maintaining a common nuisance, a class D felony, possession of

marijuana, a class A misdemeanor, and possession of paraphernalia, a class A misdemeanor.

On October 8, 2012, Mullins filed a motion to suppress based upon the officers' warrantless entry of the residence. During a hearing on the motion that was conducted on December 18, 2012, Cody testified that he had been released from jail one week earlier and had spent about three nights at the residence. Cody did not have a key to the house, so he used a knife to enter. At some point, Cody stated that he saw "a guy" standing across the road, who asked him what he was doing. Tr. p. 21. Cody became angry and replied that it was "none of [his] business." Id. at 21, 23. Cody then saw the officers outside and complied with their request to leave the house.

Marshall Baugh told Cody that Deputy Plummer was inside checking for other individuals. Cody alleged that he was just sorting through his clothes in the garbage bags to change, but that he was not moving. Frank testified that his brother lived there after getting out of jail and that his landlord, Frank Bonaker, would not have known that Cody was living there.

On December 18, 2012, the trial court denied Mullins's motion to suppress, finding that "the search of the residence was conducted under an exception to the warrant requirement." Appellant's App. p. 57. More particularly, the trial court ruled that the "search was done incident to an arrest for burglary, in areas where the Defendant had been located or of adjoining areas that could reasonably contain a hiding person who

6

might have jeopardized the officer's safety." Id. Thereafter, Mullins filed a motion to certify the trial court's order for interlocutory appeal, which we granted on May 6, 2013.

## DISCUSSION AND DECISION

### I. Standard of Review

In determining whether the officers' entry and subsequent sweep of the residence for other suspects and potential victims was valid, we initially observe that our standard of review for the denial of a motion to suppress evidence is similar to other sufficiency issues. In particular, we determine whether substantial evidence of probative value exists to support the trial court's denial of the motion. We do not reweigh the evidence and consider conflicting evidence most favorable to the trial court's ruling. However, this review is different from other sufficiency matters in that we also consider uncontested evidence that is favorable to the defendant. Duncan v. State, 799 N.E.2d 538, 542 (Ind. Ct. App. 2003). We may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason that the trial court enunciated. Scott v. State, 883 N.E.2d 147, 152 (Ind. Ct. App. 2008).

### II. Fourth Amendment Claims

As discussed above, Mullins argues that the trial court erred in denying her motion to suppress because the search of her residence was improper. More particularly, Mullins claims that the police officers' actions were conducted under the "guise of a protective sweep" and, therefore, violated the Fourth Amendment to the United States Constitution. Appellant's Br. p. 11.

7

The Fourth Amendment protects privacy and possessory interests by prohibiting unreasonable searches and seizures. Johnson v. State, 710 N.E.2d 925, 927 (Ind. Ct. App. 1999). The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State. Carr v. State, 728 N.E.2d 125, 128 (Ind. 2000). For a search to be reasonable under the Fourth Amendment, a warrant is required unless an exception applies. Montgomery v. State, 904 N.E.2d 374, 378 (Ind. Ct. App. 2009).

One specific exception was recognized in Bryant v. State, where our Supreme Court determined that "police may enter private property to protect that property when they reasonably believe the premises have recently been or are being burglarized." 660 N.E.2d 290, 300-01 (Ind. 1995). As a result, it was found that such an entry and search does not offend the Fourth Amendment because the emergency circumstances surrounding a potential burglary justify the action. Id. at 301. The search, however, is limited to areas in which an intruder could reasonably conceal himself. Thus, police officers may not use such situations as an excuse to conduct a general search for evidence. Id.

The facts in Bryant established that the police received an emergency call from a neighbor, who reported that a home alarm was sounding. When several sheriff's deputies arrived at the scene, they observed fresh pry marks on an open door. It was determined that entry by the police to conduct a protective sweep of the residence did not violate the Fourth Amendment because:

8

The totality of these circumstances reveals that exigent circumstances justified the search. The sounding alarm, fresh pry marks and open door led police to a reasonable belief that a burglary was in progress or had recently occurred. The officers searched no more area than was reasonably necessary, but still discovered hundreds of marijuana plants in plain view. Admission of evidence found during the search was therefore not error.

Id.

Here, there is no question—nor does Mullins contest—that the officers reasonably believed that the residence was being burglarized when they arrived. Indeed, the dispatch that was issued indicated that a burglary was "in progress" at the Wolcottville residence. Tr. p. 3. The dispatch included a description of the suspected burglar and indicated that he had entered the residence with a knife. Id. at 4, 6, 13, 18. The witnesses to the burglary were still talking with the dispatcher on the telephone and advised that the individual was loading electronics and other property into garbage bags. Id. at 4, 6. Deputy Plummer and Marshall Baugh arrived within minutes of the call.

The witnesses at the scene were on the street when the two officers arrived and identified the residence for them. Tr. p. 5, 13. Through the large front bay windows, Deputy Plummer noticed a man matching the description that the witnesses gave, in the living room, loading CDs and electronic equipment into garbage bags. At this point, the information that the witnesses supplied regarding the description of the suspected burglar, his presence in the residence, and his seemingly criminal actions, were verified by the officers on the scene. All of this information led to the reasonable belief that a burglary was in progress.

9

Deputy Plummer immediately ordered the man, who was later identified as Cody Mullins, from the residence at gunpoint. Cody complied and was patted down and handcuffed. The officers did not ask Cody any questions at that point, although Marshall Baugh recognized him from a prior arrest. Tr. p. 7, 19. And Deputy Plummer did not speak with Cody until after the initial cursory sweep of the premises. Tr. p. 8, 14-15, 22. More particularly, Deputy Plummer did not know Cody's name or his claimed purpose for being there at the time of the entry and subsequent sweep of the residence.

While Marshall Baugh detained Cody, Deputy Plummer immediately entered the residence through the main door that was open and cleared the residence for other suspects and potential victims. Tr. p. 7. In our view, the officers' conduct was entirely reasonable. Although the witnesses did not state whether any other suspects were involved, Deputy Plummer did not have personal knowledge that Cody was alone, and entry by a second suspect could have been made outside the witness's observation from the front of the residence. In other words, it was reasonable for the officer to confirm that Cody was alone in the residence.

Additionally, as was noted in Maryland v. Buie, the United States Supreme Court observed that a protective sweep may be conducted in rooms that immediately adjoin the place of the arrest or of areas that might, given facts articulable by the searching officer, contain a person who is hiding that might jeopardize the officer's safety. 494 U.S. 325, 334-35 (1990). And in interpreting Buie, at least one federal court of appeals has specifically held that Buie permits the police to "walk through rooms adjacent to the one

10

in which they make an arrest to ensure that no danger lurks within." United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995). It has also been determined that

> [o]fficers should not be forced to suffer preventable risk of ambush, even where a location is so isolated that the officers could conceivably be protected without entering the area. An ambush in a confined setting of unknown configuration is more to be feared than if it were in the open, more familiar surroundings.

United States v. Tapia, 610 F.3d 505, 511 (7th Cir. 2010).

Applying the above principles, we believe that the scope of Deputy Plummer's sweep through the residence was reasonable because the record shows that each room was cleared only for places that a person might hide. As noted above, Deputy Plummer did not touch anything or open any drawers. Tr. p. 7, 9. Moreover, the situation here that involved an on-going burglary permitted Deputy Plummer to conduct a cursory sweep of the entire residence to clear what he reasonably believed to be a crime scene. Even more compelling, there is no evidence establishing that Deputy Plummer used this situation as an excuse to conduct a general search for evidence, which the holding in Bryant prohibits.

In short, Mullins's claim that the protective sweep of the residence was unlawful under the Fourth Amendment fails, and the trial court did not err in denying Mullins's motion to suppress.

### III. Indiana Constitution

Notwithstanding our conclusion that the protective sweep and warrantless search of the residence did not violate the Fourth Amendment, Mullins argues that the police officers' actions violated the provisions of Article I, Section 11 of the Indiana Constitution. More specifically, Mullins asserts that the protective sweep was not reasonable in this instance because "the officers had little degree of concern, suspicion or knowledge that a violation ha[d] occurred." Appellant's Br. p. 9. Therefore, the "five minute search of the entire Mullins home was highly intrusive and law enforcement needs did not justify or require the search." Id.

The purpose of Article I, Section 11 is "to protect from unreasonable police activity, those areas of life that Hoosiers regard as private." Trotter v. State, 933 N.E.2d 572, 580 (Ind. Ct. App. 2010). Although the language of Article I, Section 11 tracks the Fourth Amendment verbatim, Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure. Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005). Instead, the legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of police conduct under the totality of the circumstances. Id.

The reasonableness of a search or seizure depends on a balance of: "1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs." Id. at 361. The burden is on the State to

12

show that the intrusion was reasonable in light of the totality of the circumstances. Hathaway v. State, 906 N.E.2d 941, 945 (Ind. Ct. App. 2009).

In this case, Mullins does not prevail on her claim that the degree of intrusion was beyond what was necessary to execute the arrest because the officers had sufficient concern or knowledge that a "knowing violation had occurred" under the first factor under Litchfield. When Deputy Plummer responded to the dispatch of a burglary in progress, the information given to him by the witnesses was confirmed by him at the scene. Tr. p. 4-6. As noted above, the police officers could see Cody inside the residence loading property into garbage bags. Id. at 4-5, 14. In short, the degree of concern, suspicion, or knowledge that a violation had occurred in this case was high. Once Cody was removed from the living room and handcuffed outside, Deputy Plummer immediately conducted the cursory entry and sweep for other suspects and potential victims. And he asked no questions at that point. Id. at 6-8, 14-15, 19, 22.

Also, Deputy Plummer's cursory entry and sweep of the house was minimally intrusive in light of the seriousness of the situation. The sweep lasted only four to five minutes, Deputy Plummer did not touch anything, and did not open any drawers. Id. at 7-8. Rather, he looked only in places where a person might hide. Id. at 7. Moreover, an accomplice or injured homeowner could have been present at the residence. In short, the intrusion by Deputy Plummer was no greater than the parameters set forth in Bryant—areas in which an intruder could conceal himself.

13

Finally, we note that the need for law enforcement to conduct a sweep of the crime scene was high. The situation was on-going, and all of the facts suggesting a burglary in progress were confirmed by the officers prior to entry. And such an uncertainty created by the totality of the circumstances created a need for the police to take immediate action. Montgomery v. State, 904 N.E.2d 374, 383 (Ind. Ct. App. 2009). Also, what Deputy Plummer knew at the time of the cursory sweep was that facts supporting a burglary in progress were called into police and he had verified those facts upon his arrival. Deputy Plummer detained an individual matching the description of a man who had gained entry into the residence by a knife after he observed the individual placing property into the garbage bags. Deputy Plummer then swept the suspected crime scene for other suspects and potential victims.

In our view, Deputy Plummer's actions were reasonable under the totality of the circumstances and under the Indiana Constitution. As a result, Mullins's challenge to the trial court's denial of her motion to suppress under the Indiana Constitution fails.

### IV. Remaining Grounds for Motion to Suppress

Finally, Mullins claims that the trial court erred in denying her motion to suppress on other grounds regarding the validity of the search warrant, her arrest, and a recorded statement that she made to police officers several days following her arrest.

In general, we note that a party "may not add to or change [the] grounds for objections in the reviewing court." Treadway v. State, 924 N.E.2d 621, 631 (Ind. 2010). And any ground not raised at trial is not available on appeal. Id. Also, issues not

14

properly presented to the trial court in ruling on the interlocutory order are unavailable on interlocutory appeal. Curtis v. State, 948 N.E.2d 1143, 1147 (Ind. 2011).

In this case, we note that Mullins did not move to suppress the evidence in the trial court on the basis that the search warrant was invalid, nor did she challenge the validity of the arrest or the propriety of her recorded statement. Appellant's App. p. 44-45, 56. No evidence was presented on these issues at the suppression hearing, and the parties did not brief these issues. Also, Mullins's motion to this court to certify the trial court's order did not include any search warrant issue or challenge to her arrest or recorded statement. Rather, Mullins's motion addressed only the initial cursory entry and search. She may raise these remaining issues by objecting at trial.

The judgment of the trial court is affirmed and this cause is remanded for trial.

FRIEDLANDER, J., and VAIDIK, Jr., concur.